J-S13016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.M.S., A MINOR | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.S., FATHER | : | No. 1518 MDA 2021 |

Appeal from the Decree Entered November 1, 2021
In the Court of Common Pleas of Berks County
Orphans' Court at No(s):  87597

BEFORE:   STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                **FILED: MAY 25, 2022**

Appellant, S.S. ("Father"), appeals from the decree entered in the Berks County Court of Common Pleas, granting the petition of Appellee, Berks County Children and Youth Services ("CYS"), for involuntary termination of Father's parental rights to his minor child, G.M.S. ("Child").  We affirm.

The relevant facts and procedural history of this appeal are as follows. Child was born in 2012.  When Child was two years old, her parents could not care for her, and Child went to live with maternal relatives.  In 2016, Father pled guilty to various offenses related to an incident of domestic violence against C.E.J. ("Mother").  Father remains incarcerated for these convictions, but he will reach his maximum sentence in July 2022.

_____

[*] Former Justice specially assigned to the Superior Court.

In 2020, Child resumed living with Mother, who has a history of drug abuse.

> On July 22, 2020, [CYS] filed an emergency petition for custody of the Child. As a result, the [court] temporarily transferred custody of the Child to [CYS]. On July 29, 2020, [the court] conducted an adjudication and dispositional hearing. Following that hearing, [the court] transferred legal and physical custody to [CYS] for placement purposes. [The court] also ordered Mother to comply with certain services, treatment, and substance testing. [The court] found aggravated circumstances existed in regard to Mother, as she had previously had [her parental] rights involuntarily terminated to another child (who would be a half-sibling to the Child).

> Father was incarcerated at the time [and] did not attend the July 29, 2020 hearing and [the court's] order called for a plan for services for Father to be developed upon his release from incarceration. It was not until [the court] issued a subsequent order on December 23, 2020 (following a permanency review hearing) where Father was included to comply with all recommendations of [CYS].

> The trial court expanded the initial list of obligations through subsequent orders entered in connection with the dependency proceedings as a result of Father's continued failure to make suitable progress. Among other things, the trial court ordered Father to:

> (a) Participate in casework sessions through [CYS] and comply with any recommendations;

> (b) Sustain a stable lifestyle, including appropriate housing and a sufficient, legal source of income;

> (c) Exhibit stable mental health and participate in any recommended evaluations and treatment;

> (d) Exhibit a stable, clean and sober lifestyle, and participate in any recommended evaluations and drug/alcohol treatment and random urine screens as scheduled;

> (e)     Exhibit a safe and violence-free lifestyle, participate in any recommended evaluations and treatment; and
>
> (f)     Exhibit appropriate parenting skills, and participate in parenting education.
>
> As set forth in greater detail below, Father failed to comply with services and/or make sufficient progress to permit reunification with the Child.  As such, the Child remained in the custody of [CYS] for approximately seven consecutive months before [CYS] filed its petitions to terminate Mother and Father's parental rights….

(Trial Court Opinion, filed January 13, 2022, at 3-4) (internal footnotes and some capitalization omitted).

On March 1, 2021, CYS filed petitions for involuntary termination of Mother and Father's parental rights.  The court conducted termination hearings on October 25 and 29, 2021.  At the hearings, the court received testimony from Mother, Father, Child's therapist, and the CYS case worker. On November 1, 2021, the court entered a final decree terminating Father's parental rights.[1]  Father timely filed a notice of appeal and concise statement of errors on November 23, 2021.

Father now raises two issues for this Court's review:

> Did the trial court err in finding that [CYS] met its burden for termination of [Father's] parental rights under 23 Pa.C.S.A. [§] 2511(a)(1), (2), or (5), despite credible evidence presented by [Father]?

_____

[1] The court also involuntarily terminated Mother's parental rights, but she is not a party to the current appeal.

> Did the trial court err by finding that [CYS] established by clear and convincing evidence that the emotional needs and welfare of [Child] would be served by termination of [Father's] parental rights?

(Father's Brief at 7).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable

the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYS filed a petition for the involuntary termination of Father's parental rights on the following grounds:

### § 2511. Grounds for involuntary termination

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.[2]

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his … parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Father's issues are related, and we address them together. Regarding Section 2511(a)(2), Father contends that his incarceration alone is not determinative of his capacity to parent Child. Father insists that he will be released from prison in July 2022, and he has already planned for a life with Child after incarceration.

---

[2] CYS also sought the involuntary termination of Father's parental rights under Section 2511(a)(1) and (5), but we need only analyze Section 2511(a)(2) for purposes of this appeal.

Although the court found that Father failed to demonstrate an ability to follow through with court-ordered obligations, Father cites the CYS caseworker's testimony that she referred Father for one service: parenting classes. Father claims that "he immediately signed up for parenting courses in the prison but, due to the COVID-19 outbreak, no courses were offered and he was placed on a waiting list." (Father's Brief at 22). Father complains that CYS did not attempt "to contact the prison to discuss what services [Father] had completed before the Child came into care, or to discuss the prison's ongoing screenings for mental health and sobriety." (*Id.* at 23). Father also emphasizes his own testimony that he completed additional coursework for anger management, domestic violence, and mental health and wellness recovery. Thus, Father disputes the court's conclusion about his ability to comply with court orders.

Regarding Section 2511(b), Father asserts that Child "felt some clear attachment to [Father]; her second foster family indicated that [Child] talked about him … with an enthusiasm that made them uncomfortable." (*Id.* at 25). Father argues that CYS did not actually investigate whether Child would benefit from having contact with him, and Child's caseworker and therapist possessed a clear bias in favor of adoption. Father further argues that "in the rush to have the Child adopted, [CYS] and its allied professionals have … failed to assess her needs and welfare." (*Id.* at 26). Father concludes that CYS failed to prove that he lacks the capacity to parent, and the court erred in

terminating his parental rights. We disagree.

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.B.*, 990 A.2d 762, 771 (Pa.Super. 2010). Under Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" *Interest of K.M.W.*, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (quoting *In re E.A.P.*, 944 A.2d 79, 82-83 (Pa.Super. 2008)). "The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his … child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his … children." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

"Importantly, a parent's 'recent efforts to straighten out [his] life' upon release from incarceration does not require that a court 'indefinitely postpone adoption.'" *Interest of K.M.W., supra* at 474 (quoting *In re Z.P., supra* at 1125).

Under Section 2511(b), the court must consider whether termination will best serve the child's needs and welfare. *In re C.P.*, 901 A.2d 516 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* at 520 (internal citations omitted). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121 (internal citations omitted). "The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his … rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001).

Instantly, the court received testimony from Lauren Howard, the CYS caseworker. Ms. Howard testified about the court-ordered services that Father

needed to utilize following the December 22, 2020 permanency review hearing. (*See* N.T. Hearing, 10/29/21, at 137). When asked whether Father had engaged in any of the services, Ms. Howard responded:

> The only service that I'm aware of is that he reported that he was doing parenting education classes where he's incarcerated, but I have received no documentation that that's been completed.

(*Id.*)

Father's testimony conflicted with Ms. Howard's claim. Specifically, Father stated that he had complied with all court-ordered services:

> [CYS] asked me to go through a mental health evaluation, a drug and alcohol evaluation, a domestic violence group, a violence group, to demonstrate a sober living. I know everything off the top of my head because I made sure I checked all of that off. A parenting class, also. The only thing I haven't completed, and that's due to COVID-19—they shut down classes—is the parenting, and right now I'm currently enrolled in that, but I just have to wait until things pick up, but by that time I'm going to be on the street.

(N.T. Hearing, 10/25/21, at 50-51). Father added that he obtained certificates memorializing his completion of this coursework, and he sent the relevant transcripts to Ms. Howard. (*See id.* at 59-60).

Observing this conflicting testimony, the court noted that "[n]othing would indicate such certificates were ever received by Ms. Howard or anyone at [CYS], nor were any such certificates offered as evidence by Father's counsel at the termination hearing." (Trial Court Opinion at 6). Consequently, the court credited Ms. Howard's testimony. (*See id.*) We reiterate that the trial court is the sole determiner of the credibility of witnesses, and all conflicts

in testimony are resolved by the finder of fact. *See In re Z.P., supra*.

The court also received testimony from Lynette Nisley, Child's therapist since November 2020. Ms. Nisley, who testified as an expert in the field of attachment and trauma therapy for children, provided insight regarding Child's relationship with Father. Ms. Nisley explained that Child has experienced significant loss and trauma due to "multiple moves among family members, not being with her biological parents, [and] placement in foster care." (N.T. Hearing, 10/25/21, at 16). When their therapy sessions commenced, Child "did not really have any memory" of Father.[3] (*Id.*) In March 2021, Ms. Nisley and Child reviewed a packet of cards and letters that Father had sent to Child by way of CYS. (*See id.*) Ms. Nisley described Child's reaction to the letters as follows:

> As I was reading through the letters that he sent, there were times when [Child] would shake her head and say, "That's a lie," and especially when he was saying things like he's going to come back for her and he loves her. She would— she got irritated and didn't feel like she believed or trusted what he was saying in the letters.

(*Id.* at 17).

Ms. Nisley admitted that Father expressed a desire to communicate with Child. Child, however, "was not interested in having any contact with him."

---

[3] Father testified that he has not seen Child since she was three years old. (*See* N.T. Hearing, 10/25/21, at 50). Although Father expressed a desire to have Child visit him at the prison, in-person visits could not occur due to the prison's COVID-19 protocols. (*Id.* at 46).

(*Id.* at 28). Specifically, Child was upset that Father "had resisted agreeing to her move earlier in the spring to [a] pre-adoptive home … and [Child] was concerned about him interfering with her being able to be adopted." (*Id.*) Despite Child's feelings, Ms. Nisley contacted Father's prison and offered to set up a phone call for Father to discuss Child's treatment. (*See id.*) Father did not respond to Ms. Nisley's offer. (*Id.*)

Further, Ms. Nisley opined that Child had made progress in therapy, and there was a "dramatic improvement in terms of [Child's] ability to regulate her emotions." (*Id.* at 17). Nevertheless, such progress is "a very fragile thing" for Child, who still lacks "that sense of trust and security in her life that she's going to be okay and that she is going to be safe and stable." (*Id.* at 18). Ms. Nisley and Child had discussed the termination of Mother and Father's parental rights, which Child did not oppose:

> [Child] wants very much to be able to stay in the current home. Because of all the transition she has had, she has a lot of anxiety about having to move somewhere else. And honestly, from a treatment—from a trauma perspective, she has already experienced many attachment losses, and I feel like it is very important for her not to have an additional attachment loss.

(*Id.* at 20).

The court reviewed the testimony from the termination hearings and acknowledged that Father will be released from prison in July 2022. (*See* Trial Court Opinion at 5). Rather than focusing on Father's incarceration, however, the court emphasized Father's absence from Child's life before his

incarceration:

> The last time Father resided with the Child was sometime in 2014. Even before coming into the custody of [CYS], the Child's life was unstable.

> * * *

> Father does not deny he was more apparition than substance in the Child's life. He further admits he is [in] no position to provide for the Child currently. Father does, however, say he is trying to be in a better position to help the Child. He told the trial court he's "done everything that he can" to be in contact with the Child and develop a relationship. These efforts, since Father has been incarcerated, would appear to be having written letters to the Child.

> * * *

> While Father presents himself as optimistic about the future, he glosses over the fact that even before being incarcerated in 2017, he had not [been] living with or caring for the Child for approximately three years. This issue is not lost upon the Child, who expressed in no uncertain terms to caseworkers, therapists, and directly to the trial court that she desires permanency and wishes to be adopted by her current resource family. The Child said she does not wish to leave her current home. She is anxious for the dependency process to be over and bluntly stated she wants no contact with Father.

(*Id.* at 5, 8). We accept the court's analysis, which is supported by the record. Contrary to Father's assertions, CYS did not "rush" to have Child adopted. Rather, Child's therapy sessions have given her the opportunity to process feelings for Father, who Child never really knew. Despite Father's offer to open a line of communication, Child repeatedly expressed her wish to remain in the pre-adoptive home.

On this record, the court did not err in determining that Father's incapacity or neglect caused Child to be without essential parental care, and the causes of the incapacity or neglect cannot or will not be remedied. **See Interest of Lilley, supra**. The court correctly observed that Father's parental deficiencies predate his incarceration, and Father's plan to straighten out his life upon his release from incarceration does not require an indefinite postponement of the adoption that Child seeks. **See Interest of K.M.W., supra**. Additionally, terminating Father's parental rights would not destroy an existing, necessary, and beneficial relationship for Child. **See In re Z.P., supra**. Based upon the foregoing, the record supports the court's conclusion that clear and convincing evidence supported termination of Father's parental rights under Sections 2511(a)(2) and (b). **Id.** Consequently, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/25/2022

- 14 -